UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) Case No. ED CR 25-00310-KK-1 |
| Plaintiff, | ) |
| | ) Riverside, California |
| vs. | ) |
| | ) Monday, November 10, 2025 |
| JOSEPH BLANDON-SAAVEDRA, | ) |
| | ) (10:04 a.m. to 11:23 a.m.) |
| Defendants. | ) (12:00 p.m. to 12:11 p.m.) |
| ______________________________ | ) |

TRANSCRIPT OF MOTION TO DISMISS [42]
FINAL PRETRIAL CONFERENCE
BEFORE THE HONORABLE KENLY KIYA KATO
UNITED STATES DISTRICT JUDGE

| | |
|---|---|
| Appearances: | See next page. |
| Court Reporter: | Recorded; CourtSmart |
| Courtroom Deputy: | Twyla Freeman |
| Transcribed by: | Jordan Keilty<br>Echo Reporting, Inc.<br>9711 Cactus Street, Suite B<br>Lakeside, California 92040<br>(858) 453-7590 |

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

APPEARANCES:

For the Plaintiff:

COURTNEY N. WILLIAMS, ESQ.
Assistant United States Attorney
Office of the United States Attorney
3403 Tenth Street, Suite 200
Riverside, California 92501
(213) 501-6079

For the Defendant:

AYAH SARSOUR, ESQ.
CHAD J. PENNINGTON, ESQ.
Federal Public Defenders Office
Riverside Office
3801 University Avenue
Suite 700
Riverside, California 92501
(951) 276-6346

Riverside, California; Monday, November 10, 2025 10:04 a.m.

--o0o--

(Call to Order)

THE CLERK: Calling ED CR 25-310, United States of America versus Joseph Blandon-Saavedra.

Counsel, please make your appearances.

MS. WILLIAMS: Good morning, your Honor. Courtney Williams on behalf of the United States.

THE COURT: Good morning.

MR. PENNINGTON: Good morning, your Honor. Chad Pennington, Deputy Federal Public Defender, on behalf of Mr. Blandon-Saavedra. I'm joined by co-counsel Ayah Sarsour. Defendant is present to my left but in Immigration custody, and we are benefitted by Spanish language translation.

THE COURT: Thank you. Good morning, and good morning to you, Mr. Blandon-Saavedra.

THE DEFENDANT (through interpreter): Good morning.

THE COURT: Are you able to understand the interpretation being provided to you?

THE DEFENDANT: Yes.

THE COURT: Thank you.

We had set today for a final pretrial conference. However, more importantly, we have Defendant's two motions. The first is the motion for release from Immigration custody

or dismissal of the indictment based largely upon the difficulties that counsel has had fulfilling the Sixth Amendment since their client has been placed in Immigration custody.

And then we have a second motion that was filed. It's a motion to dismiss or for alternative remedies due to spoliation of the evidence, in violation of Rule 16, and that was filed on October 29th, 2025.

I did order expedited briefing on the second motion, and I have received the Government's opposition as well as the Defendant's reply. I would note that in my order regarding expedited briefing, I specifically directed the Government to provide all evidence, including communications and correspondence regarding what, if any, action the Government took to preserve the evidence, and I don't believe that I've received anything that is directly responsive to that.

Is that correct?

MS. WILLIAMS: That is correct, your Honor.

THE COURT: All right. Then, Mr. Pennington, on October 23rd, I ordered that Mr. Blandon-Saavedra be brought to this courthouse Monday through Friday in order to facilitate counsel's ability to communicate with him. I have received the supplemental declarations, but my question for you is in the days that have passed since that order,

are there any other days where your ability to meet with your client was interrupted other than the days that are referred to in the supplemental filings?

MR. PENNINGTON: Your Honor, there's one additional day where there was an impediment that goes beyond the declaration. May I have just a moment to confer?

THE COURT: Yes.

(Pause.)

MR. PENNINGTON: Your Honor, we have nothing further to submit beyond the declarations.

THE COURT: All right. And with respect to your meetings with Mr. Blandon-Saavedra at the courthouse, have you been able to meet with him with the assistance of a Spanish language interpreter?

MR. PENNINGTON: We have, your Honor.

(Pause.)

THE COURT: And, so, ultimately, with respect to that motion, Mr. Pennington, my question is other than the days that you've identified in your supplemental declaration, has there been anything that has been preventing you from meeting with your client and preparing for trial?

MR. PENNINGTON: Your Honor, there's been nothing preventing us from meeting with him. There has been an aspect that has prevented us from preparing for trial, and

that is Mr. Blandon-Saavedra's state when he arrives for the meetings. This is highlighted in our declaration, but there's extreme sleep deprivation that he's suffering from right now. When he shores up, he presents very tired. My understanding through my conversations with my client is that he is sleeping on average two to three hours a night. The situation at Adelanto is very difficult with regards to getting sound sleep.

So, his ability to participate in the defense and give us information to tell us his version of his events, to direct us to conduct investigation, I do believe that the -- that the placement still compromises that component of our defense, your Honor.

THE COURT: And would you be prepared to submit a declaration from your client on those issues?

MR. PENNINGTON: I would, your Honor, absolutely.

THE COURT: All right. I'm going to ask you to submit that no later than Wednesday --

MR. PENNINGTON: Thank you, your Honor.

THE COURT: -- so that it's part of the record.

I do have a question, Ms. Williams, with respect to the removal proceedings. I know that there was one date -- I believe it was November 5th -- where Mr. Blandon-Saavedra was not brought to the courthouse and the Government informed me that the reason he was not brought to

the courthouse was that he was having a removal hearing. What is the status of his removal proceedings?

MS. WILLIAMS: As I understand it, your Honor, that was more of a -- an arraignment, an initial appearance of his removal proceedings, and he has a date the -- it's been -- his hearings have been reset for sometime early December.

THE COURT: Is there a reason that they've been reset for early December? He's been in Immigration custody since the end of September.

MS. WILLIAMS: I -- I do not know. I can get more information from the agent if your Honor can give me a brief -- a brief moment. The agent's in the courtroom.

THE COURT: Yes. Go ahead.

(Pause.)

MS. WILLIAMS: So, actually, the agent did not have more information, but my understanding was that what the -- the hearing that occurred no November 5th I believe was an arraignment or an initial appearance. And, so, I still believe that because there's no final order of removal, he has to go through the entire process.

THE COURT: But I guess my question is really if he has been in Immigration custody since the end of September, is there a reason -- and -- and I don't know if it's, you know, proper to describe it as an initial

appearance, but is there a reason, assuming that was an initial appearance, that did not happen earlier?

MS. WILLIAMS: I can submit a declaration. I can certainly talk to -- I've been in communication with HSI legal counsel, and I can talk to her to see if she has more information and submit a declaration to the Court if the Court would prefer that.

THE COURT: And I think really the question that I have is what would the timeline for his removal proceedings have been absent the criminal prosecution?

MS. WILLIAMS: Yes, your Honor.

THE COURT: Presumably, there -- he's been proceeding on a different timeline because of the pending criminal case than he would have been if there was not a criminal case, and I'm curious as to whether he would have, in fact, perhaps even been removed from the country by this date.

MS. WILLIAMS: Well, the one thing that I can say is that this particular Defendant is from Nicaragua. And, so, I think that there has been some issues with that in terms of like getting a plane or getting transportation to Nicaragua. I think that is -- also plays into some of the delays as well.

THE COURT: All right. But that would not be a reason for the delay of what we're calling the initial

appearance, correct?

MS. WILLIAMS: Yes, your Honor.

THE COURT: All right. So, again, my question really goes to what would the timeline have been absent the criminal prosecution?

MS. WILLIAMS: Yes, your Honor.

THE COURT: All right. And I'm going to ask you, Ms. Williams, in light of our trial set for next Monday, to also get that to me no later than Wednesday.

MS. WILLIAMS: Yes, your Honor.

THE COURT: Thank you.

MR. PENNINGTON: Your Honor, briefly, if I may add. My understanding from Mr. Blandon-Saavedra is that he did not meet with -- he did not personally appear before the Immigration tribunal on the 5th. I think his counsel may have, but he did not.

THE COURT: Even by video?

MS. WILLIAMS: Even by video.

THE COURT: So, then why was he not brought to the courthouse?

MS. WILLIAMS: I was told that he had a hearing and that he had to be present for that hearing. I can, again, talk to Homeland Security Investigations to get more information about that. It would seem strange to me that his defense counsel would appear without the client for this

hearing. But, again, I don't have any information to that.

THE COURT: All right. But, Mr. Pennington, you are representing to me that Mr. Blandon-Saavedra did not appear, whether in person or by video, at that hearing?

MR. PENNINGTON: That is correct, your Honor. He's conveyed that to us multiple times subsequent to November 5th and on November 5th -- or, pardon me -- after November 5th, that he did not appear before the Immigration tribunal either in person or through video. He was placed in an adjacent cell, to my understanding, roughly an hour and a half or two hours, but he never made the formal appearance.

I, from my conversations with him, understand that his defense counsel was present in that facility, his Immigration defense counsel.

(Pause.)

THE COURT: Ms. Williams, does the agent have anything to add on that issue?

MS. WILLIAMS: One moment, your Honor.

(Pause.)

MR. PENNINGTON: Your Honor, may I have a moment as well?

THE COURT: Of course.

MR. PENNINGTON: Thank you.

(Pause.)

MS. WILLIAMS: No, your Honor, he does not have any more information.

THE COURT: So, at the moment, in light of Mr. Blandon-Saavedra's representation through his attorneys that he was not present at a hearing either in person or remotely, it appears that there was no basis to not transport him to the courthouse on November 5th.

MS. WILLIAMS: If that -- if those representations are true, then yes. But it was my understanding that he had a court hearing in Immigration Court. I even attached, I think, the notice of hearing, to -- to the notice that I filed on the docket. And, so -- and, without more information from enforcement and removal operations, I -- I don't -- I don't have anything else to say.

THE COURT: And, Mr. Pennington, are you in communication with the attorney who is representing your client in the removal proceedings?

MR. PENNINGTON: Your Honor, we've made several attempts to reach Mr. Zulu. That's the Immigration counsel on behalf of Mr. Blandon-Saavedra. We have not been successful yet. I do think it's accurate that there was some proceeding scheduled for November 5th. We didn't find out about him not physically appearing either by video or in person until the day subsequent when I met with him in lockup downstairs. So, I -- I think it's accurate there was

a scheduled matter on November 5th, but he did not appear for it, for whatever procedural reasons there may have been in the Immigration matter.

We're truing our best to reach Mr. Zulu, but we -- we haven't been successful yet, and it's been multiple attempts.

THE COURT: All right. Thank you.

Then, Mr. Pennington, since it is your motion, I'd be happy to hear further argument on either of them.

MR. PENNINGTON: Your Honor, I'll start with I think we've perfected the record with regards to the initial motion to dismiss. I'd like to spend most of our time today with spoliation issue, and we are requesting dismissal.

I think we can start with what is the difference between useful evidence versus material exculpatory evidence. I listened to the oral arguments in Youngblood and Trombetta over the weekend and this morning. I think the dichotomy that the Court can glean is useful evidence is evidence that's not going to be introduced by the Government in its case in chief. There's a testing component to it. There's a materiality component to it with regard to the discovery process, but there's no intent on the Government to presumptively introduce that information in its case. Material evidence, exculpatory evidence, that's when the Government does intend to introduce the evidence, and it

goes to the core elements of the case.

I think we can discern that the Government's going to attempt to --

THE COURT: Mr. Pennington, I'm going to ask you to slow down just a little bit.

MR. PENNINGTON: Sure. Certainly, your Honor. Thank you.

THE COURT: Thank you.

MR. PENNINGTON: I think that we can discern that the Government, your Honor, is going to attempt to introduce the collision in its case in chief. That's clear from its complaint. The evidence of the collision is obvious on page five. That was clear from the -- the detention order proceedings where the Government argued the collision supported an inference of at least flight.

The Government today proposed a joint statement of the case. The joint statement of the case reads in part:

"The Government alleges the Defendant crashed his car into the cars of two federal officers."

The state of the vehicle is material. It's exculpatory. The Government intends to introduce this evidence at trial.

So, I think, your Honor, you can stop at the material exculpatory analysis. They're different. If the

evidence is material exculpatory, the Court doesn't wade into good faith. If it's merely useful, the Court does wade into good faith.

So, I'll start with materiality, why is it material. It goes, again, to the elements of the offense. Also, as noted in Cooper, it goes to the weight of the Defendant's claim of innocence, attesting to determine -- it likely will determine who hit who. The Government does not claim otherwise. It doesn't offer any forensic or expert analysis of any kind. We offer the declaration from Mr. Snook (phonetic), and he states that the testing will allow an opinion of the vehicle's crush profile, the paint transfer, the direction, the force and the sequence of the impact.

There's no comparable evidence for this testing, your Honor. In Trombetta, as we go to comparable evidence, the -- the question there was there was comparable evidence because the DUI's machine operator could testify as to the results of the DUI testing. There's no expert that can test what's not present anymore in this particular case, and that's from Mr. Snook's declaration.

Pictures are only half the puzzle, he states. The photos give him really nothing to testify to. He needs the in-person evaluation to do the physical inspection, to evaluate the crush profiles, the transfer of the paint, the

deformation patterns, the mechanical damage, the angles to determine direction force and the sequence of the impact.

Mr. Snook stated that without access to the unrepaired vehicles, which is our current state, it is almost impossible to tell who caused the collision because the photographs on their own are not good enough. They cannot capture three dimensional imaging, impact related characteristics. They cannot provide the precise measurements required for the complete and accurate reconstruction.

And we can analogize this to Cooper. In Cooper, there was no comparable evidence. The question there was methamphetamine production. And the Defendants had produced chemical vats that they claimed determined that they were not making methamphetamine because the chemical vats that they had constructed couldn't withstand the heat making process in production of meth.

Here the -- it's identical. So, it's a -- the testing there hinged on a question of factual innocence. If the actual vats at issue in Cooper could not withstand the meth making productions, that they would be factually innocent. They weren't making methamphetamine, as the Government alleged in Cooper if the machines they were using can't cook methamphetamine.

Same thing here, your Honor. They're testing to

determine who hit who. So, the lost of that testable evidence, it cheats the Defendant out of the opportunity to establish the weight of their claim of innocence.

I think the argument is could the Defense be put in a better position with or without the loss of evidence, and that gets into a separate question of remedy. But that's not the analysis when it's material exculpatory. The question is not whether the Defendant would be put in a better position through some other source of evidence. The question now is the -- the jury itself loses the most important probative evidence that relates to his claim of innocence, your Honor.

So, in -- Cooper, it's material exculpatory. And the Court can rely on Cooper here to find that the evidence at issue is material and is exculpatory.

If he didn't hit -- if Mr. Blandon-Saavedra didn't hit the agents, he didn't assault them. The principal piece of evidence that would determine who is going to hit who or who had hit who, it's gone. that's the same thing that happened in Cooper.

If the vats demonstrated that the defendants were not making meth, they're factually innocent. If the testing here determines and shows that Mr. Blandon-Saavedra did not hit the agents as the Government alleges, he is factually innocent. There's no assault.

Same issue here, your Honor. We lose the absolute claim of our innocence, to present that information to the jury.

If your Honor wants to go into useful evidence, we get into the analysis of good faith. And, so, we could spend some time talking about good faith here. The question of good or bad faith, your Honor, it hinges on the apparent exculpatory value. The apparent exculpatory value of the evidence at issue here was -- was readily apparent from the beginning.

The Government argued that the detention hearing hearing that the collision was a basis for detention, they argued that that demonstrated a risk of flight. So, at the very beginning of the proceeding, your Honor, they know the apparent exculpatory value of this information.

In a discovery dated September 4th of 2025, the Government was on notice of Mr. Blandon-Saavedra's claim of innocence. In Bates page 16, he states that the -- that the agents hit him. So, from the beginning, before we have a detention hearing, before the proceedings begin in this case, the Government was aware of how important this piece of evidence would be to its case in chief and to Mr. Blandon-Saavedra, and they destroyed it anyway.

From the beginning, at the -- and, your Honor, again, we've emphasized this quite a bit, but it's so

obvious in the complaint that this information is of extreme exculpatory value. It really undercuts any claim of the Government that they don't intend to introduce this evidence in their case in chief. It certainly undercuts a claim of good faith on their part.

Also, Government counsel in this case is named in the complaint. They can't necessarily fake -- or feign ignorance of the importance of the vehicle. It's their complaint. Judge Kim commented that this matter could very well be trial bound. We knew where this case was going from the outset, your Honor.

From the Del Toro case, there's no bad -- there's bad faith when the evidence is routinely destroyed or lost by the Government with no knowledge that the evidence is likely exculpatory. We can talk about the routine aspect later, but as to knowledge, the Government knew this had potential exculpatory value from the very beginning of the case, your Honor. In Bates page 16, Mr. Blandon-Saavedra is saying the agents hit him. The very early stages of their investigation, Mr. Blandon-Saavedra is claiming factual innocence.

Who hit who is the important factual question for the Court to determine, your Honor. If he didn't hit them, he is innocent. They can't meet their elements. They knew right away in their investigation that he was claiming they

couldn't meet their elements.

THE COURT: And, Mr. Pennington, do I have a copy of that Bates 16 that you're referring to? I know that I have the cover sheet from the Government to the Defense with that initial production of evidence, but do I actually have that page?

MR. PENNINGTON: Your Honor, you do not. I can give you a copy if you'd like right now.

THE COURT: Yes, please. Thank you.

(Pause.)

THE COURT: Just give me one moment.

MR. PENNINGTON: Certainly.

(Pause.)

THE COURT: All right. Go ahead.

MR. PENNINGTON: Thank you, your Honor.

Going to the Court's order here, the chronology, the estimates, the payment, the payments, the repairs, that all happens after the discovery demand is served in this case. We served the discovery demand on September 8th. The actual process of getting it repaired, the estimates, the repairs, that happens after. No work had been completed until after the discovery demand. No payment had been tendered until after the discovery demand. No estimated had been completed until after the discovery demand.

The value of this evidence and the requirement to

preserve it under Rule 16 was apparent right away and was apparent in the discovery demands, and the Government, nonetheless, went ahead and had the vehicle estimated. They had it paid for, and they had it repaired all after the discovery demand was served, your Honor. That's a demonstration of not good faith.

We talk about a pattern and practice in our motion. We have the Casteo -- Castillo Ortega case. It's the identical charge. It's 18 United States Code 111(a)(1) and (b). It's an alleged assault on a federal officer with a deadly weapon. The repaired vehicle in that matter featured prominently -- prominently in the complaint, page six. There's now a pending dismissal in that case because the Defendant has been removed, but the chronology is somewhat comparable or very comparable. You have a complaint filed on 7/22, July 22nd. A discovery demand is submitted on August 6th. Discovery is served on August 19th with the representation from the Government that they'll make items available for inspection and it will be preserved. On October 17th, the Defense finds out for the first time that the alleged vehicle involved in the crash that was in the complaint had been repaired.

The Government claims that the repair was not intentional. That's -- I don't think that can be supported in the record. They went ahead with the repair because they

needed to process the payment for the repair. They needed to get the payment done because there might be budgetary issues. That shows intentionality on the part of the Government. That shows haste. They made the repair because the funding was limited and set to expire.

In cases such as Cooper, Silva, Zargoza (phonetic), a question becomes what efforts did the Government counsel take to preserve evidence. I think that's directly at issue in your order as well, your Honor. Here there's no evidence that the Government counsel instructed the agents to stop after the discovery demand was submitted. There was no evidence that Government counsel at the time it received the repair -- or, pardon me, when it received the discovery demand said if there's repairs ongoing, stop them. There was no evidence at all that it was communicating, Government Counsel, with the Immigration agents, notifying them that a discovery demand had been made, notifying Immigration agents that inspection had been sought, notifying the Government Immigration agents of the need to preserve the evidence.

When the discovery is produced on October 1st, Government counsel stated it would make such evidence available. Those obviously have actually not taken any steps to make such evidence available or to preserve such evidence, your Honor. That is evidence of bad faith.

In Cooper, the bad faith was Government counsel -- nobody told the company holding the actual evidence, which in that particular case was these vats of methamphetamine alleged, to hold that evidence.

Same is true here. Government counsel never tells HSI to not repair -- or not proceed with the repairs. Repairs hadn't started yet. There's no instruction to stopo whatever inquiry was ongoing at that point. There's nothing. There's no communication at all letting HSI know that there had been a discovery demand made by the Defense.

I also want to talk about HSI, your Honor. HSI, Homeland Security, they bring criminal cases all the time. They're one of the more common federal agencies that go investigations that give rise to indictments. Arguably, right now, they're the most. They know of their discovery obligations. The know of a criminal proceeding, your Honor. They know of Rule 16. They know the obligation to preserve the evidence.

So, HSI's internal policy regarding cars or auto repairs, it's certainly not controlling. It doesn't subordinate the Constitution. It doesn't subordinate Rule 16. But HSI is very familiar with criminal investigations. It brings criminal investigations all the time. It knows of its duty to preserve evidence, certainly under a discovery demand if submitted, your Honor.

In -- sorry, your Honor. Just a moment.

(Pause.)

MR. PENNINGTON: In Zargoza, there was a finding of bad faith that the evidence had been destroyed because it was not destroyed pursuant to any ordinary procedures. When HSI brings a criminal case, it's aware of what ordinary procedures are, and that is preservation of the evidence, your Honor.

Again, Government counsel here, they knew of the value, like in Zargoza, police knew from the very beginning that the vehicle would be useful -- pardon me. In Zargoza, they knew from the very beginning that the evidence would be useful to the Defense. The same is true here. In the very beginning page 16, as we offer, the Government is aware that Mr. Blandon-Saavedra claiming that they hit him, the Government hit him. From the very time they had their first meeting with him, they knew of this value. All the same, the vehicle was destroyed. And it's destroyed because there's not the type of communications request to make sure the evidence is being followed and being preserved that you would expect in this kind of investigation, the scrupulous requirements, and it's simply not going on. Immigration agents are trying to get the bill paid before funding runs out. So, they just hastily go ahead and do it. But that lack of communication, that divergence from what is standard

discovery protocol, that should not be found to the Government's benefit in any way. That should be found only to Mr. Blandon-Saavedra, and that supports dismissal because it supports a finding of bad faith.

In Zargoza, the Court opined that when the Government fails to comply with preservation requests and allows evidence to be destroyed, it likely runs afoul of Rule 16 and that that type of destruction the Court specifically used the words "It's disturbing." It's disturbing here as well.

Prejudice to the Defense. The jury can't see the evidence unaltered. Like in Cooper, we've lost the narrative power of the physical evidence. We've lost the power of an expert opinion. Mr. Snook said the Government -- if our client is saying the Government caused the accident, we can't have expert opinion on that.

The Government could retain an expert, and the Government expert could say Mr. Blandon-Saavedra wsa hit by the Government -- by the Immigration agents at issue, and that was exactly what the issue was in Cooper. The problem was why it was material exculpatory -- material and exculpatory and why dismissal was warranted. It's because the loss of the evidence puts the case in the position where it can't be tried with experts now. You cannot assume what the experts will opine, including the Government experts.

When there's two possible conclusions, Mr. Blandon-Saavedra caused the accident or the Immigration agents caused the accident, you can't speculate as to what those experts would determine, and that's lost now, your Honor. And that's precisely the issue at play in Cooper.

The evidence can neither support nor undermine the Defense's assertion of innocence. That is the problem. We don't have the objective testimony to break the competing claims of causation.

Also at issue in Cooper and Zargoza as it goes to prejudice, Mr. Blandon-Saavedra cannot be expected to testify to fill up the evidentiary gaps. You can't expect him to waive one constitutional interest because the Government violated another constitutional interest. His testimony simply constitutionally cannot be used to show up the loss of evidence, your Honor.

And the Ninth Circuit was clear in both Cooper and Zargoza that's a no go. To the extent the Court wants to fashion a remedy here, it can't say Blandon-Saavedra's testimony can fill the evidentiary gaps. He has an unqualified right to not testify.

Your Honor, with regards to remedies, I think we've laid out our case for why we think the dismissal is appropriate. But if your Honor has any further questions about the scope of the remedy, I'm happy to answer those.

But at this time, we'll rest.

THE COURT: All right. Thank you.

Ms. Williams?

MS. WILLIAMS: Yes, your Honor. First I want to start with your Honor's order asking the Government to turn over any evidence or any like emails or correspondence where the Government requested that HSI preserve the -- or preserve the vehicles or any evidence in this case. And, to that I would say that there is no emails -- there were no emails for -- for me to turn over because I never asked HSI to preserve the vehicles, and the reason I never asked the agents to preserve the vehicle in this particular is because the due process clause does not impose on the Government an undifferentiated and absolute duty to retain and preserve all material that might be of conceivable evidentiary significance in a particular prosecution. The due process clause does ask that the Government preserve exculpatory evidence. And in this particular case, the Defendant crashed his vehicle into two different police officers, and the particular vehicles are inculpatory evidence and certainly not exculpatory evidence because the damage on the vehicles are consistent with what the witnesses for the Government would testify to what happened in this particular case.

THE COURT: But that's assuming that the

Government's version of the incident is the only version. And isn't it correct, as Mr. Pennington points out, that as early as September 11th, the Government was aware that Mr. Blandon-Saavedra's likely defense was going to be that, in fact, he was the person hit by the agents rather than the reverse?

MS. WILLIAMS: So, to that I have two points. First, what the case law says is that when evidence has a possibility of exculpating a defendant while also having the possibility of incriminating a defendant, it has no apparent exculpatory value. So, that's first.

And where -- the Government could use it as incriminating, and the Defense could potentially use it as exculpatory evidence, it has no apparent exculpatory value. And the Government is under no legal requirement to preserve evidence that has no exculpatory value.

Now, to your second point, was the Government --

THE COURT: But -- but, following that through to its logical conclusion, because the Government in filing a case presumably believes that they can prove an offense beyond a reasonable doubt. And under that subjective interpretation of what's required, why would the Government ever have to make a request to preserve evidence?

MS. WILLIAMS: Well, so, let me back up. So --

THE COURT: No. I -- I'd like you to answer that

question, right, because the Government's theory of the case is always going to be incriminating. That's why they bring a case. They think an offense has been committed.

And, so, following your argument through to its logical conclusion, why would the Government ever have to make a request to preserve evidence?

MS. WILLIAMS: Well, in this case the Government did make a request to preserve the photographs in this particular case. What the case law says is that we cannot be -- we cannot -- the Government doesn't have to assume every conceivable evidentiary significance and then preserve that. What the Government is legally obligated to do is to preserve exculpatory evidence, and that's what we did in this case. We preserved the photographs in this case. We preserved the Instagram video and -- the Instagram video in this case. We preserved the audio of the Defendant's statements in this particular --

THE COURT: But -- but why wouldn't there be a similar request to preserve the condition of the vehicles, which is going to be the best evidence of what occurred rather than the photographs, which for all of the reasons that Mr. Pennington has put on the record, are not a sufficient alternative to the actual vehicles?

MS. WILLIAMS: Well, first I'd like to slightly push back on that a little bit. I don't believe that the

vehicle in this particular case is the best evidence. I think that the photographs that document and show the vehicles as they collided and the way that the scene looked at the actual time that the Defendant rams his car into the officers is the best evidence.

THE COURT: I understand that that's the Government's position, but the question is relatively simple. Whenever -- you know, you're -- if you had a personal injury case, the lawyers are going to want to view the vehicles. It's basic. You could ask -- you don't need to be a lawyer to know the evidentiary value of the actual vehicles in a case where the collision is the subject of the litigation, and that's what we have here.

MS. WILLIAMS: Again, respectfully, I would like to push back on that a little bit. I think from a defense attorney's perspective, maybe a defense attorney would believe that that's the best evidence, but certainly, we -- certainly, we don't believe that that's the best evidence, and we don't believe the vehicles were exculpatory evidence. And legally we're not obligated to preserve evidence that is not exculpatory.

And I will just say that in every case that was cited by defense counsel, in those particular cases, the defense attorneys are making very specific evidentiary requests. They're asking that the Government preserve

breath samples. They're asking that the Government preserve maybe the vehicle. They're asking that the Government preserve the -- the beakers where the methamphetamine was cooked and -- in Cooper. So, they're making specific requests.

But, in this case, what you see is defense counsel submits a very blanket and general request to preserve -- and I just want to quote -- to preserve document paper data, computer records, photographs -- which we did -- video recordings, audiotapes.

They're making very blanket general requests to preserve -- to preserve everything. And, so, then they're relying and assuming that the Government has the same view of the evidence, in which he has -- in which the Defense has. In -- in this case, when I receive this and I'm asked to preserve the photographs, that's exactly what I did. Now, if Defense Counsel had submitted a request that we specifically preserve the vehicle in this case, I would have done just that, as I have done. Because there are two vehicles in this case, one for Count 1 and one for Count 2, and I just want to put on the record so the Court can note this, that the second vehicle has been preserved. It has not been fixed, and defense counsel has made no effort, zero effort to go view that vehicle. He's claiming that this -- that this evidence is so material to his defense and it --

it comprises an entire count. He has made no effort to go see that particular vehicle, and I think that cuts against his argument.

Also, he references another case where he was defense counsel, and that case also had an auto collision. He said that -- I believe the case is about to be dismissed for other reasons. And he was the defense attorney on that particular case. So, he knows that HSI has a policy in which they repair vehicles, and it would have been incumbent upon him to submit a very specific request asking that we preserve the vehicle, and I definitively can tell you I would have done so.

But in the cases that he -- he references, there are no general blanket discovery requests. All the defense attorneys are making very specific requests for the evidence that they would like to be preserved.

And then, so, then getting back to the exculpatory value of this particular case, I just will address Defense arguments in the order in which you made it.

What the case law requires is that the evidence be exculpatory and that that exculpatory value be apparent at the time that the evidence was either destroyed or repaired and that there be no comparable evidence.

And I don't believe that Defense Counsel has met his burden on -- on any of those -- on any of those things.

I would like to point out in his -- in his motions, Defense Counsel states that he would list an accident reconstructionist. At the point where we're even talking about an expert having to be listed to talk about the value of the evidence, it is clear that that -- that it's not exculpatory on its face and that the police knew of its value before it was repaired, because even by Defense Counsel's own admission, the only way that the vehicles have any kind of value is if a expert can -- an expert can evaluate the evidence.

And then in this particular case, there are photographs, and we do believe that the photographs are comparable to the vehicles in this case. And the Government -- the Government was not intending to use the actual vehicles in its case in chief. The Government was only intending to use the photographs in its case in chief.

And I also want to point out that I believe this is a very similar situation that happened in Youngblood, where the Government failed to refrigerate clothing and perform tests on the semen samples. Defendant -- Defendant stated that his expert could not perform any tests on the samples because it was likely believed that he would not get any evidentiary value from them. And the Court still found to find a due -- still declined to find a due process violation because there was no bad faith on the part of the

Government.

And, so, for here, I would -- I'd make the same argument. While he has listed an expert or an accident reconstructionist, number one, first of all, all the findings that are listed in Ms. Sarsour's declaration are speculative at best.

Number two, there is still a vehicle that is available. This -- the vehicle from Count 2 and the Defendant's vehicle -- the Defendant's vehicle returned to him -- that can be examined have not been examined.

And then, number three, even in Youngblood where Defense made a similar argument that the -- his expert could no longer evaluate the evidence, the Court still found that there was no due process violation because there was no bad faith on the part of the Government.

And then Defense Counsel also referenced Cooper. And I would like to respectfully push back on his characterization of Cooper. In Cooper, the Court found that the -- that the Government acted in bad faith, and in Cooper, defense counsel made a specific request and called the agent in that case specifically, and the agent said that they were going to preserve or retain that evidence while simultaneously knowing that their departmental policy was to destroy contaminated evidence. So, that was the issue in Cooper is that the Government specifically acted in bad

faith, not that there was no comparable evidence for I think it was like beakers or supplies or equipment that the defendants were using to either make methamphetamine or some other kind of legal or legitimate drugs.

The issue in Cooper was not comparable evidence. The issue in Cooper was bad faith and that there -- there was specific evidence that the Government acted in bad faith after defense counsel made a very specific request for what kind of evidence should be preserved and retained.

And, so, then we talk about useful evidence. I do agree and I do concede that I -- that the evidence in this case could potentially be useful for defense attorney, but I think that once we start talking about the usefulness of the evidence, we have to start talking about bad faith as -- as the law requires. And in this particular case, there was no bad faith. I submitted emails from the Agency that showed that the incident occurred September 4th in the -- in the morning, and literally that afternoon, they were talking about and acquiring estimates to try to get it in before the Government shutdown in the end of the fiscal year. And, so, that is their normal practice.

Now, Defense Counsel references that HSI knows of their legal obligations and that they still chose to fix the vehicle. And, so, that I will say, this is a very unique situation. A lot of times, when you have firearms and

knives, those pieces of evidence don't have any useful value outside of it being a piece of evidence.

In this particular case, we submitted a declaration from the Agency that says that there 450 agents that are using 11 vehicles. And, so, it becomes an issue when one of the vehicles are damaged. And, as I stated, they were dealing with the end of the fiscal year, and, so, they wanted to get the vehicle in and fix the vehicle before the Government shutdown in the end of the fiscal year.

I would agree wholeheartedly with Defense Counsel that if this were drugs, a firearm, a knife or something of that nature where it doesn't have any other useful value, that that evidence should be preserved. But in this particular case, this -- the vehicle has useful value that the agents have to use. And asking victims to not repair their vehicles and to simply preserve it so if the Defense makes a request to see it, then they can see it. I just don't believe it's reasonable. And the reason I say that too is because, again, there's a second vehicle in this -- in this case that has been preserved that is sitting around that is not being used, and Defense Counsel has made zero effort to go view that vehicle.

One moment, your Honor.

(Pause.)

THE COURT: And, just so I'm understanding, am I

right that the theory of the Government's case with respect to these two vehicles is that one of them, Mr. Blandon-Saavedra sort of was driving forward and hit that vehicle, and is it correct that the other vehicle was damaged when there was a reversal of his vehicle?

MS. WILLIAMS: Yes. So, what happened was the officers surveilled his house. They saw him coming out of his home. They -- he got into his vehicle. They followed him with lights on. One vehicle went to the front, like far in the front, and I -- I believe went parallel to try to block him off, one vehicle in the back, and then a third vehicle came on the side of the driver's side diagonally. The Defendant stopped, saw the vehicles, reversed into the vehicle that was behind him and stopped again and then forwarded and then laid on the gas and hit the third vehicle that was on the side.

THE COURT: And, so, which of those two vehicles is the one that has been repaired?

MS. WILLIAMS: I believe it's the -- the one that -- one moment, your Honor.

(Pause.)

MS. WILLIAMS: It's the one that was diagonal in the front --

THE COURT: All right.

MS. WILLIAMS: -- that has been repaired.

THE COURT: So, the one that he was driving forward allegedly into rather than the one that he reversed and made contact with?

MS. WILLIAMS: Yes, your Honor.

THE COURT: Okay. Go ahead.

MS. WILLIAMS: And, so, basically, just to sum up, I think the biggest issue in this case is the fact that the Government made -- I mean, that the Defense Counsel made a blanket discovery request where he doesn't reference the vehicle at all. Had he referenced the vehicle, I 100 percent would have had or made efforts to preserve that vehicle, but when you submit a blanket discovery request and expect that the Government is going to believe that what you deem to be material to your case that I'm also going to deem material to his case, I just -- I don't believe that to be true. I believe that the -- that the photographs in this case were great evidence that showed the vehicles as they were, as they collided, and it -- and it shows the scene as -- as it was when the incident occurred, and the -- the vehicles in this particular case were consistent with what the agents said. And, so, they were not exculpatory. They were incrim -- they -- they were not exculpatory. They were inculpatory evidence, and legally we're not under any obligation to preserve inculpatory evidence.

And then one last thing I -- I do want to

apologize. Defense Counsel references Rule 16. Rule 16, first, doesn't kick in until indictment. So, that's first. And then after indictment, it's incumbent upon the Defendant to make the request. And then the evidence has to be in the Government's custody and control. And, so, first, the indictment was field September 24th, and the Defendant had his PIA September 30th. And, so, that -- when the indictment occurred, that's when Rule 16 kicks in.

Exculpatory and Brady kicks in at the complaint stage. But I'm just only addressing the Rule 16 argument that he made. So, it -- it only kicks in at the indictment stage, and the Defendant has to make the request. I don't believe Defense Counsel made that request. And then, third --

THE COURT: Isn't -- but isn't the discovery letter dated September 8th?

MS. WILLIAMS: It is. But, again, in the discovery, it's a very blanket general request that does not reference the vehicles at all and the preservation.

THE COURT: But you're not saying they had to make a separate request for discovery after indictment?

MS. WILLIAMS: No. I'm -- I'm only saying that in their discovery request, especially since defense counsel has dealt with this situation before on another case, I think he is required to ask specifically that we preserve

the vehicles, and that's what you're seeing in every other case, preserve, you know, the clothing or the semen samples or the breath samples. In one of the cases cited by Defense Counsel, they were asking to preserve or to turn over tax returns.

They're making very specific requests. They're not making general requests. And, so, I don't believe that Defense Counsel made the request that -- that is required under Rule 16. And then, even if he did -- let's just say he did -- it has to be in the custody of the Government. And at the time he made the request, the vehicle was already in the shop being repaired. And, so, it wasn't in the Government's custody and control.

And -- and, so, for those reasons, I don't believe that the evidence was exculpatory and that we had a legal obligation. And then --

THE COURT: All right. But you're not disputing that because it was the Government's vehicle, had the Government requested that the repair shop preserve the evidence, that request would not have been honored?

MS. WILLIAMS: To be completely frank, I don't know, because I -- I don't know if you can -- certainly, before it goes to the repair shop, certainly if we -- if he made that request, we could have preserved it. But at the point --

THE COURT: But that defies common sense. If I take my vehicle to an auto body repair shop and I change my mind, if I instruct the repair shop to stop all repairs, they're going to follow my instructions.

MS. WILLIAMS: No, 100 percent, certainly, if the repairs had not been made.

THE COURT: Correct.

MS. WILLIAMS: Correct, yes. I do believe that. But, again, I just don't -- that request was not made here. And, so, I guess there's no exculpatory value. While the evidence is potentially useful, the -- I don't believe that Defense Counsel has shown the type of animus -- I just want to get the -- the language right. They have to show official animus toward Defendants or a conscious effort to suppress exculpatory evidence, and then he references Zargoza, and in that particular case -- in that particular case, the Court did find that, again, a specific request for a video was made, and that the agents destroyed the -- the video not in the normal course of the Government's usual procedures. And, so, again, that was bad faith.

And here what we see is the vehicles were repaired in normal course to HSI's procedures. There was no specific request by the Defense. And, so, for all those reasons, I think that the Court should deny the Defendant's motion.

THE COURT: Thank you, Ms. Williams.

Mr. Pennington?

MR. PENNINGTON: Thank you, your Honor. I think with -- I'll start with the question of custody. The vehicles were absolutely in the Government's custody at the time that we served the discovery demand. They were in the Government's custody at the time the estimates were sought, at the time the repairs were completed, the time that the payment was rendered.

And, again, we don't know specifically when the vehicle was -- the repairs were commenced. We know when payment was given, but we had this six-week gap that we've identified in our briefing.

Cooper was absolutely about both bad faith analysis and about comparable evidence. And what the Court concluded in Cooper is that the -- Mr. Blandon-Saavedra, his testimony can't be used as a source of comparable evidence because of the accompanying constitutional rights that attach to his testimony. Moreover, the -- no comparable evidence could work because the expert's findings would be diminished because you have two possible alternative conclusions that are available, and the jury, the Court and the parties could not anticipate what either set of expert would conclude, the Government's expert or the Defense's experts, your Honor.

I also want to talk about the -- the date on which

we served our discovery demand. When we served our discovery demand on September 8th, it lists items that we want, that we are expecting to get. We also cite to Rule 16(a)(1)(E). Rule 16(a)(1)(E) specifically says tangible evidence, your Honor.

So, we're asking for the preservation of tangible evidence. There's no doubt that the vehicles at issue are tangible evidence. We're citing to the applicable rule of procedure. The Government's aware of the applicable procedure. They're -- they're aware of that text.

Moreover, when the Government responded to the discovery demand on October 1st, over three weeks later, they don't at any point say that there's vehicles that have been repaired. Just so you know, vehicles have been repaired, and we find that request outside of the scope of 16(a)(1)(E) or outside of the scope of your initial discovery demand.

They said, We'll make -- we'll make available -- we'll make issues available -- evidence available for inspection. They don't at any point then represent that the vehicles would not be subject to the discovery demand because they hadn't been communicating with HSI. There's no evidence they were. They weren't aware of what HSI was doing with regards to preparing and preparing the vehicles.

Moreover, your Honor, let's talk about a departure

from standard discovery protocols or a standard policy. HSI's repair policies is not the kind of standard discovery protocol the case laws are talking about. That's something extrinsic. That's something completely different. And I think the standard that the Government cites to is animus or intentionality or consciously having the evidence destroyed.

The Immigration agents are consciously having the evidence destroyed. They're repairing the car because there's fiscal issues, and they want to get reimbursed. And this is the challenge that the Government uses when you have these agents using their -- using these fleet cars for these kinds of operations. They may need to act with haste to get the repairs concluded, but their limited vehicle availability, the scarcity or dearth amount of vehicles, that is not a Rule 16 carve out. That's something completely different, your Honor.

THE COURT: But -- but, just to be clear, the standard protocol, whether or not it was followed, is not referring to repairs of vehicles but, rather, evidence preservation under the case law. That's what they're referring to, correct?

MR. PENNINGTON: That's correct, your Honor. Absolutely. It's preservation of evidence and the right to inspect the vehicle.

The Government is sort of saying, We think that

this evidence is entirely inculpatory, but obviously we have a Defendant here who's maintaining factual innocence. And the value of this evidence, it's true they don't have to preserve any conceivable piece of information. This goes well beyond conceivability or any conceivable information. This is the core of the case. This is the elements of the assault, who hit who. They knew of this value of the -- they knew of the value of the evidence right away. They knew its materiality.

They argued at the detention hearing the vehicle that's been repaired does feature prominently -- most prominently in the complaint. That's on page five. Their statement of the case today is alleging that Mr. Blandon-Saavedra crashed into them. This is not any conceivable evidence. This is the core of the evidence. This is the most single important piece of evidence that will be at issue in this trial. This goes well beyond any conceivable evidence.

Also, your Honor, the materiality standard under Rule 16 is different than Brady materiality. It's a much broader type of materiality because it talks about pretrial investigations, the ability to prepare a defense, not just the remedy when you have the loss of evidence in the case in chief, your Honor.

And, so, the Government's materiality obligation

is both the production of evidence during its trial, but it's also its discovery obligations, and they didn't produce evidence that clearly had material value for the purpose of Rule 16, which is preparing the defense, your Honor. We don't have an expert now that can produce the information or produce a comparable or competent opinion.

And I want to talk about the Defense's efforts to inspect the vehicles. We consulted Mr. Snook. Mr. Snook, the expert that we're considering said that at this point, there's nothing that can be done. Photos will not do. That's exactly what happened in Cooper is that photos were not adequate. Same thing is true here. He's saying what the Government has produced so far -- the Government can claim all it wants that this is good evidence. It maybe good evidence, but that's not really the issue. The issue is is that the evidence has been lost, the most important evidence that could resolve the conflicting claims of who hit who, your Honor.

So, we have tried our best to do something to shore up the Government's disruption of the evidence, but Mr. Snook is effectively saying that that really can't be done at this point.

Our time has been burned so bad in this case because of the placement in Adelanto. We don't have time to send people to look at vehicles that have been destroyed or

look at vehicles that don't replicate the entire body of evidence that was available at the time of the collision, your Honor.

The first time we had an opportunity to meet with Mr. Blandon-Saavedra was because of the placement in Adelanto. It was October 27th. We met with him, and at that time he gave us his version of the events. Immediately after we met with him, we asked to have the vehicles inspected. That was the first time, October 27th, that we found out that the vehicle at issue had been repaired, your Honor.

Your Honor, may I have a moment?

THE COURT: Yes.

(Pause.)

MR. PENNINGTON: Your Honor, just a moment.

(Pause.)

MR. PENNINGTON: Your Honor, you can see in the other matter too we -- we -- when we saw the Castillo Ortega, when we sought production of the vehicle for inspection, we found out that day that that vehicle had been repaired. At that -- in that particular proceeding, we didn't get any representations as to an HSI internal policy regarding repair, your Honor. We offer Castillo Ortega because it demonstrates the same pattern of you have a charge, you have discovery demand. You have discovery

production saying, We'll make such items available for your inspection, just like you did here, and then when we try to act upon the inspection that had been guaranteed, we find out that items that are probative can't be inspected, your Honor. That's the significance of Castillo Ortega.

(Pause.)

MR. PENNINGTON: Your Honor, briefly, with regards to photographs, Cooper, te Ninth Circuit is saying photographs are not adequate. In Silva, case we cite, photos, again, they were not good enough. The Court said the prejudice to defendant was there without any expert witness.

And our case presented only with photograph would have concluded next to nothing could be determined from them, the same thing as here. That's what the Court's saying in Silva. You can't look at the photos and really determine anything of significance as to causation. Mr. Snook concluded the same thing. There's photographs, sure. But as to using the state of the vehicles to determine who caused who, the photographs are effectively useless, your Honor.

Silva was of no -- it was -- a remedial instruction was given. It was not dismissal. But, all the same, the case is important because it's demonstrating that photographs themselves, your Honor, they're just -- they're

not adequate -- they're not adequate replacement evidence. They're certainly not comparable evidence as the Court has found what constitutes comparable evidence.

The Government can say that we think that it's not -- there's no need for comparable evidence, but we had Mr. Snook saying that there is no comparable evidence for the defense that we're trying to run, which Mr. Blandon-Saavedra is saying he was not the person who hit who. It was the agents. It was the inverse. The state of the vehicles is critical.

THE COURT: Mr. Pennington, do you intend to submit a declaration from MR. Snook?

MR. PENNINGTON: We can, your Honor. We submitted it through Ms. Sarsour, but we can submit an independent declaration as well, your Honor.

THE COURT: I would think that that would be appropriate.

MR. PENNINGTON: Thank you, your Honor.

(Pause.)

MR. PENNINGTON: Nothing further.

THE COURT: All right. I -- I do have a question for you, Mr. Pennington. Since it appears that the vehicle that's been repaired is the vehicle that Mr. Blandon-Saavedra is alleged to have driven forward into and we have another count with respect to the vehicle that he's alleged

to have driven back into, even assuming that I agree with you on the value of the evidence, whether it was known to the Government, whether there was bad faith, why wouldn't the second count involving the vehicle that was -- that has not been repaired, why wouldn't that count be untouched?

MR. PENNINGTON: Your Honor, I think that it goes to the point of a total defense of who hit who, your Honor. So, if you have -- if the -- if the full narrative of the defense is that it's the Government that is -- it's the agent that hit him starting, I think that the -- the remedy there regarding the second vehicle is just not simply going to be adequate, your Honor.

His position is is that the agents hit him twice. They struck him, and then they struck him again. Getting that beginning -- the whole entire picture I think is critical, your Honor. I don't think that we can separate the counts that way.

THE COURT: But wouldn't it be helpful to investigate and have your expert investigate the vehicle that has been -- that has not yet been repaired?

MR. PENNINGTON: Your Honor, our conversations with Mr. Snook is that the photographs themselves are not adequate, and there's really -- it's -- it's almost impossible to recreate the accident scene as is right now with -- with the destruction of one of the vehicles, your

Honor.

And I think it's important to note that there is a subtle burden shifting that the Government's engaging here right now. Its obligation -- the Government -- the Defense has to demonstrate prejudice certainly, but the Government has to justify its actions as well. It's a core component of the analysis.

And we consulted an expert who says the evidence as is, in-person inspection is not going to be adequate, your Honor. It's -- what the Defense doesn't -- really doesn't have an obligation to do is try its best to remedy the Government's defect here. The Government destroyed the evidence. With what's left, we consulted Mr. Snook, and Mr. Snook said recreation is -- of the accident is going to be virtually impossible if not --

THE COURT: Without both vehicles?

MR. PENNINGTON: Without both the vehicles.

THE COURT: And, Ms. Williams, is there a reason why the second vehicle hasn't been repaired according to that same protocol that you've cited?

MS. WILLIAMS: So, it was two different agencies, one with HSI. So, that was fixed pursuant to HSI --

THE COURT: But the ERO vehicle has not yet been fixed?

MS. WILLIAMS: Yes. And he did make a request.

It hasn't been fixed because we made a specific request that they not repair the vehicle after we learned that the Defendant would like to review them.

MR. PENNINGTON: I'm not sure what date the Government's counsel's alluding to because we -- we requested inspection on -- on September 8th. So, I'm not sure if the communication with ERO occurred when. They indicated that the inspections would be made available on October 1st, when they made the initial production, your Honor.

MS. WILLIAMS: I just want to clarify. There was no mention of vehicles in -- in the Defendant's discovery request. They made a request about tangible objects. Tangible objects and physical objects -- physical evidence in this case can be photographs and the Instagram video which we provided and an audio of the Defendant's statements. And in reference to their wanting to inspect, we did -- Defense Counsel can inspect the meta data for the photographs, for the videos, and for any of the physical evidence we actually have. But there's no reference to an actual vehicle in their discovery request.

THE COURT: I understand, and I have a copy of it.

I think the final question I have for you, Mr. Pennington, is we do have a current file date of November 17th. In light of the issues that you've faced meeting with

your client, would you be prepared to go to trial on that date?

MR. PENNINGTON: No, your Honor.

(Pause.)

THE COURT: All right. Very well. Then what I'm going to ask, I think, Ms. Williams, you intended to supplement the record with the information that you're going to obtain from I think it's HSI.

Mr. Pennington, if you feel it's appropriate, I would submit a declaration regarding the circumstances that Mr. Blandon-Saavedra's encountering in terms of his sleep deprivation and how that's impacting preparation.

I would also -- if you would like to supplement the record with a declaration from Mr. Snook.

And, finally, in addition to the cases that you've cited in the pleadings, if there are other recent cases either within this District or beyond, where there's been an adverse credibility finding by either a judge or a jury with respect to similar cases, I think would be helpful for the record to have those.

MR. PENNINGTON: And, your Honor, to that point, if I may, that -- that's exactly what happened in the Silva case is that you had a vehicle that was seized by the Government. There was an allegation that there was a compartment in the vehicle containing methamphetamine.

Later on, the vehicle's auctioned off, and it's repaired so that compartment containing the methamphetamine, it cannot be tested by the Defense. It can't be replicated. And in that case, the remand was to give the Defendant a specific remedial instruction, and this would be the instruction we would seek in this case, which is defense counsel had no opportunity to inspect the vehicle because the Government failed to preserve the vehicle, in violation of a court order.

The court order here would be your Honor's standing order regarding Rule 16(a)(1)(E). To the extent we seek an adverse jury instruction, we think -- which is much less a remedy -- we think the record here supports dismissal. But if we got to an adverse jury instruction, we would ask that it be similar to Silva.

THE COURT: But I'm assuming it's your argument that that instruction would not be sufficient?

MR. PENNINGTON: It's not, your Honor, no. I think dismissal based on this record is far more appropriate. We're still going to be at a disadvantage because of the Government's destruction of the evidence, even with that jury instruction.

MS. WILLIAMS: And can --

THE COURT: Yes.

MS. WILLIAMS: Briefly, I just wanted to put on

the record on Wednesday Defense Counsel made a discovery request. San Bernardino Police Department did arrive on scene to document the accident, and they requested body worn camera footage, dash camera footage and then belt recording footage as well and then meta data from -- from these items.

The person that was responsible for this discovery request didn't return to work until today. And, so, I've made the request for -- to the San Bernardino Police Department, but I just wanted to let the Court and Defense Counsel know I'm not certain that that evidence will be available by the trial date.

THE COURT: And that request was made last Wednesday?

MS. WILLIAMS: Yes, the Wednesday that just passed.

MR. PENNINGTON: Your Honor, just a moment.

THE COURT: Yes.

(Pause.)

MR. PENNINGTON: The -- the request was made after the production of discovery too, your Honor.

THE COURT: All right. But it wasn't made until last Wednesday?

MS. WILLIAMS: Your Honor, may --

THE COURT: Yes.

MS. WILLIAMS: Thank you, your Honor. I made the

request after production to whom the Government was produced. So, it was a response to the production from the Government.

THE COURT: But, just to be clear, it wasn't made until last Wednesday?

MS. WILLIAMS: Yes, which is when the state -- that they produced production too.

THE COURT: All right. But the fact that we don't yet have it is no fault of the Government because they just received this request less than a week ago?

MS. WILLIAMS: So, your Honor, my understanding is those reports were reports from the scene of the incident. They were provided to us for the first time in production two, to which --

THE COURT: Which was produced when?

MS. WILLIAMS: I believe it was Wednesday.

MR. PENNINGTON: Middle of last week, your Honor.

MS. WILLIAMS: I -- I don't believe it was Wednesday, but yes, my -- the -- my agent did let me know that San Bernardino did respond, did document the scene, and did turn over some documents which I did turn over to Defense Counsel.

I'm in no way faulting them for their discovery request. All I'm saying is that Defense Counsel says they're ready for trial. We're ready for trial as well.

However, are they ready to proceed without this discovery request, because I don't believe it will be available by Monday, the trial date.

THE COURT: When do we think it will be available?

MS. WILLIAMS: It's San Bernardino Police Department. As soon as I leave here, my agent will reach out to the San Bernardino Police Department and get maybe an estimated time, but it is -- it's local police department, and --

THE COURT: Well, but I'm sure they understand that if you have a federal trial going forward, they need to hurry to get that information to you?

MS. WILLIAMS: I -- I would hope so, but I -- I do know after we leave here, the agent can reach out to the police department and get maybe an ETA for that.

THE COURT: And, Mr. Pennington, I think Ms. Williams' question is the same question that I would have, which is would you want to proceed without that evidence?

MR. PENNINGTON: I think we will -- let's try to get the evidence produced. This original -- this is part of the production of 16(a)(1)(E). We sought Rule 16 material on September 8th. If there's a delay, the delay is related not to the time in which we asked for it separately but when we made the initial request, which is September 8th.

Our intention right now, your Honor, is to proceed

to trial on November 17th.

THE COURT: All right.

MR. PENNINGTON: One last item, your Honor. We requested Henthorn discovery. I would ask that the -- that the Government's Henthorn trials -- or Henthorn files be produced to Honor in camera. The Government -- we served the Henthorn discovery demand in our initial discovery request. We've had some email volleys back and forth about Government counsel said that they don't have anything responsive to Henthorn, but the representation doesn't state that they -- they said they requested it. They don't say that they went through their files to look for it or to the extent to which they reviewed their file.

My understanding of Henthorn is that they have to review the entire file. Given that, I would ask that it be produced in camera.

MS. WILLIAMS: And I just want to put on the record what Henthorn actually says is that a -- a attorney must review the files. An attorney did review the files and communicated to me that there were nothing responsive to the officers pertaining to Henthorn in this particular case.

THE COURT: And I'm assuming that attorney was not from your office?

MS. WILLIAMS: No. The attorney was for HSI, the -- the -- the -- the agency for the officers that will be

testifying.

THE COURT: Do we also have ERO witnesses?

MS. WILLIAMS: Yes. We have -- but the Henthorn request went to -- it was a list of people, and the same thing. I got no -- nothing responsive from ERO. I think CBP, HSI --

THE COURT: But when you say nothing responsive, you're saying that an attorney told you, I've reviewed the file. There's noting in there?

MS. WILLIAMS: Yes.

(Pause.)

THE COURT: All right. Assuming that we get to trial, have the parties discussed how long they anticipate trial to take, how many days?

MR. PENNINGTON: We don't believe we have yet, your Honor. I think the Government made an initial representation at the detention hearing of I think it was two to three days, but we have not communicated since then about the length of the trial.

THE COURT: Ms. Williams?

MS. WILLIAMS: That's correct, your Honor. I believe maybe one or two days. I believe we have approximately four witnesses. I don't believe I would call all four of those witnesses. I don't believe that the testimony of any -- any of those witnesses would be longer

than 45 minutes, if that. It's a relatively simple case. There's only about 40 pages of discovery. There's one Instagram video that's approximately four to five seconds. And then there's the Defendant's statement. However, the Defendant did invoke.

THE COURT: And do you happen to know the names of the witnesses that you would intend to call?

MS. WILLIAMS: I do, your Honor.

THE COURT: Thank you.

(Pause.)

MS. WILLIAMS: So, ERO Officer Marco Perrera (phonetic). He is one of the victims. And then HSI Bradley Tomaselli (phonetic), a second victim, and then HSI Agent Elijah Mejia (phonetic). He was one of the arresting officers. And then potentially maybe a San Bernardino Officer, Joaquin Larios (phonetic) who responded to the scene to document the accident from -- yes, from San Bernardino.

THE COURT: And, so, with respect to Officer Perrera, is he the officer in the vehicle that Mr. Blandon-Saavedra allegedly backed into?

MS. WILLIAMS: Yes, your Honor.

THE COURT: And then Tomaselli is the one that he allegedly drove forward into?

MS. WILLIAMS: Yes, your Honor.

THE COURT: Thank you.

(Pause.)

THE COURT: And I think you said you anticipate not calling all four but, regardless, that their testimony is likely to be no more than 45 minutes each. Is that right?

MS. WILLIAMS: Yes, your Honor. And that's being very generous.

THE COURT: Thank you.

Mr. Pennington, I realize that you don't -- do not need to disclose anything, but do you have a sense of whether or not the let's say two-day estimate is realistic?

MR. PENNINGTON: It's hard to say, your Honor. We don't have a Government witness list yet too. Once we get a witness list, we can figure out if we're going to attack the admissibility of any evidence at that point or just to alert the Court there could be -- there could be motions filed here at some point regarding the admission of evidence.

THE COURT: All right. Let's do this. Since you are all here, I would like the three of you to confer regarding any pretrial issues, including witnesses, any evidence, so that we could have a clear sense of how many days we anticipate this trial will take, whether or not any subsequent motions need to be filed, any other pretrial issues that you think would be helpful to discuss ahead of

time, and if you could please just let Ms. Freeman know when you're ready to proceed.

MS. WILLIAMS: Yes, your Honor.

MR. PENNINGTON: Thank you, your Honor.

THE COURT: All right. Thank you.

(Proceedings recessed briefly.)

THE COURT: All right. We are back on the record in U.S. versus Blandon-Saavedra.

I had asked counsel to confer regarding pretrial documents.

MS. WILLIAMS: Thank you, your Honor.

THE COURT: And, so, where are we with respect to those?

MS. WILLIAMS: Thank you, your Honor. So, we did confer with the Government. We do believe that at this time, we can't comply with your Honor's criminal standing order (e)(4) in -- in filing attorney-led voir dire because we don't -- we believe that your Honor's ruling on the pending motions and if there's a remedy and what remedy the Court provides will impact what voir dire we will do.

THE COURT: Understood.

MS. WILLIAMS: And -- but we do believe that we do -- there's no motions that we can anticipate right now without a ruling from the Court.

THE COURT: All right. And, so, in terms of other

pretrial filings, so, trial brief from the Government, you mentioned voir dire, exhibit lists, witnesses, joint jury instructions, disputed jury instructions and verdict form. When do you think the parties could file those ?

MS. WILLIAMS: So, I believe that I can get the trial brief on -- on file probably tomorrow, but I can -- I -- it's pretty much done. I just need a supervisor to review it. And then I've completed the verdict form. So, I can get that on file today. Voir dire questions, that's completed. I can get that on file today.

THE COURT: Exhibit list?

MS. WILLIAMS: Exhibit list, I don't anticipate introducing anything but photographs from this case. And I believe I could probably get that on file today.

THE COURT: All right. And witnesses, sounds like today as well?

MS. WILLIAMS: Witness list today as well. Well, for -- in -- in reference to the exhibit list, I would be requesting maybe tomorrow only because I think I want to have the agent take photographs of the scene so during their testimony they can describe they stopped on this street and -- but it would only be a couple of additional photographs, but the photographs have already been turned over that --

THE COURT: All right. Thank you.

And then, Ms. Sarsour, in terms of your voir dire,

you said it's contingent upon my ruling, but I would assume that you could get it let's say by end of the week?

MS. SARSOUR: Yes, your Honor.

THE COURT: All right.

MS. SARSOUR: Your Honor, we did discuss trial dates as well. The Defense, we would like to time qualify the jury for four days, two days for the Government's case in chief, two days -- just so that we don't lose the jury. Again, we don't know yet if we are putting on a case. It would all be determined.

THE COURT: All right. And then in terms of the parties meeting and conferring to file the joint and disputed jury instructions, how quickly do you think you could do that?

MS. SARSOUR: Your Honor, we anticipate doing that by the end of today.

(Pause.)

THE COURT: All right. So, in terms of the motions -- and there is one housekeeping matter. The declaration -- or not the -- the Bates stamped discovery pages 15 and 16 that were provided to me during this morning's hearing, I would suggest that that be filed so it could be part of the record.

In terms of Defendant's motion to dismiss based upon the difficulties that counsel has had meeting with Mr.

Blandon-Saavedra in light of the representations and argument made today, I do believe that that motion is moot because counsel is prepared to proceed to trial on the scheduled date. So, that motion is denied as moot.

In terms of the second motion seeking to dismiss and/or other remedies for the spoliation of evidence, my question is this. At the moment, my tentative is to dismiss Count 1, which I believe is the count involving the vehicle that's since been repaired, but let me just double check that. But it does look like Count 1 involves M.P. as the alleged victim, and Count 2 involves B.T., and based upon my notes, Ms. Williams, it does, therefore, seem like the Count 1 involves the vehicle allegedly backed into. Count 2 is the vehicle that Mr. Blandon-Saavedra allegedly drove forward into. Am I correct?

MS. WILLIAMS: Yes, your Honor.

THE COURT: All right. So, my tentative would be to dismiss Count 2. That then begs the question as to what, if any, reference to the incident and collision with the vehicle in which B.T. was in, how much, if any, reference to that collision can be made in litigating Count 1?

MS. SARSOUR: Your Honor, can I have a moment to discuss?

THE COURT: Yes.

(Pause.)

MR. PENNINGTON: Your Honor, just a moment, please.

THE COURT: Yes.

(Pause.)

MS. SARSOUR: Your Honor, can we switch?

THE COURT: Of course.

MR. PENNINGTON: Thank you, your Honor.

Given the Court's tentative ruling, if we're proceeding only to trial on the one operative count, Count 1, I do believe that the Court -- that does change the Defense's perspective and position on the date of the trial.

Calculating the time in which the initial indictment was returned, I think we would have through December 9th to get to the 70-day mark.

THE COURT: And we also have time for the pending motions as well.

MR. PENNINGTON: We do, your Honor. That's correct. So, with that, I think our position, the Defense's position would be to continue the trial so we can perhaps do some motion practice, resolve the issue of what evidence could be adduced at trial regarding the dismissed count. We would offer a tentative trial date of December 8th, for example.

THE COURT: All right. Ms. Williams, do you happen to know if you're available on that date?

MS. WILLIAMS: I -- I am not actually. I have a Ninth Circuit oral argument on the 11th, December 11th. So, I will be in preparation. And -- and Defense Counsel said they wanted to have a tentative four-day schedule for this trial. I don't know if that changes based on your Honor's tentative. And then, also, I'm scheduled to be out of town that weekend as well.

THE COURT: We won't be in trial during the weekend.

MS. WILLIAMS: I know, but I don't know how long the trial -- I mean, four days, with the Ninth Circuit oral argument December 11th, starting on that Monday, December 8 -- I believe that's a Monday.

THE COURT: Well, if no one else from your office can cover this case, and it sounds like there's plenty -- if we schedule trial for December 8th, that's approximately one month from today. So, I'm assuming that perhaps somebody else from your office could even step in for one or the other, but at the very least, we could go dark on the 11th.

MS. WILLIAMS: Okay.

(Pause.)

THE COURT: All right. So, what I anticipate is issuing an order with respect to the second motion to dismiss by end of the week, and it sounds like unless something changes drastically, Mr. Pennington, your position

would then be if we have the remaining count, to continue trial until December 8th?

MR. PENNINGTON: Correct, your Honor.

THE COURT: All right. So, then in light of that representation, I am not going to order a jury for next week. We, again, will endeavor to issue an order on the remaining motion to dismiss by Friday, and then if -- if counsel would like to confer and submit a stipulation to continue the trial by Monday, I think that would be the best way to proceed.

MS. WILLIAMS: Yes, your Honor. I just want to clarify. So, your Honor said that's your Honor's tentative ruling. Are we allowed to submit briefings on --

THE COURT: Of course. If you --

MS. WILLIAMS: Okay.

THE COURT: -- would like to submit further briefing on the second motion -- so, the first motion I am denying as moot. The -- or, I'm sorry, the first motion I'm denying as moot. With respect to the second motion, the spoliation of evidence motion, as I've instructed, counsel can file any supplemental briefing no later than this Wednesday.

MS. WILLIAMS: Yes, your Honor.

MR. PENNINGTON: Thank you, your Honor.

MS. SARSOUR: Thank you, your Honor.

THE COURT: And, Mr. Pennington, would you like the order directing that Mr. Blandon-Saavedra be brought to the courthouse to continue?

MR. PENNINGTON: At this time, your Honor.

THE COURT: All right.

MR. PENNINGTON: If we seek further relief, we'll certainly motion the Court.

THE COURT: All right. Very well. Then that remains unchanged.

Are there any other issues at this time?

MS. WILLIAMS: No, your Honor. Thank you.

MR. PENNINGTON: No, your Honor. Thank you.

THE COURT: All right. Thank you everyone.

(Pause.)

THE CLERK: Court is adjourned.

(Proceedings adjourned at 12:11 p.m.)

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

/s/Jordan Keilty
Transcriber

2/13/26
Date

FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:

/s/L.L. Francisco
L.L. Francisco, President
Echo Reporting, Inc.